J. LESTER KINNEY, Appellant, *v.* FREDERICK J. LISMAN and Others, Copartners Doing Business under the Name and Style of F. J. LISMAN & Co., Respondents.*

Fourth Department, January 10, 1934.

* Revg. 147 Misc. 431.

*Frank G. Raichle* and *Jules C. Randal,* for the appellant.

*Thomas T. Cooke,* for the respondents.

SEARS, P. J. In 1928 and 1929 the copartnership of Glenny, Monro & Moll (hereinafter called Glenny) was engaged in business in the city of Buffalo dealing in investment securities and acting as a broker. On the 13th day of February, 1929, the plaintiff gave Glenny an order to purchase for him 500 shares of the preferred stock of Consolidated Automatic Merchandising Corporation, which was at that time listed and dealt in on the New York Curb Exchange, at thirty-five dollars and fifty cents per share or better. This stock went by the popular designation of " Camco, Preferred," and it is so referred to in this opinion. The order was given by plaintiff over the telephone to an employee of Glenny named Balkin. Balkin " checked the market on the Curb," that is, he made inquiries to learn what the curb market condition was at that time in respect to this stock. On that day the lowest price at which Camco, Preferred, sold on the Curb Exchange was thirty-five dollars and fifty cents. Balkin then turned plaintiff's order over to another employee of Glenny, named Doolittle, telling Doolittle that he had an order for 500 shares of Camco, Preferred at thirty-five dollars and fifty cents, and that it was quoted at bid thirty-five dollars and fifty cents, offered thirty-six dollars, or bid thirty-five dollars, offered thirty-six dollars. Balkin asked Doolittle whether he thought that the bankers, F. J. Lisman & Co., had any stock and Doolittle said that he would call that firm up. The defendants constitute the members of the copartnership doing business under the name of F. J. Lisman & Co. and are hereinafter referred to as Lisman. It appears in the case that Lisman became interested in the Consolidated Automatic Merchandising Corporation at the time that it was organized in 1928 through the consolidation of previously existing companies, and was the syndicate manager in distributing the securities of the consolidated corporation. In the original distribution by the syndicate, Glenny had taken part, first, by taking 1,000 units, each unit consisting of one share of preferred and one share of common stock, and afterwards by taking further units.

On the 13th day of February, 1929, Lisman was the owner of at least 500 shares of the preferred stock, or had options upon sufficient shares so that he could become owner of at least 500 shares by

exercising his options. At that time Lisman was engaged in a redistribution of the stock which is described by Singleton A. Traugott, one of the members of the Lisman firm and one of the defendants, in the following words: " In the first instance, the stock or security, we will say, is offered to the public by one of several mediums, and in the second instance, it is always generally some floating stock which is hanging over the market by reason of poor distribution which the house of issue and sometimes a group of other security dealers attempt to re-distribute either directly to their own customers or to other security dealers."

The following occurs in the testimony of the defendant Traugott in explanation of the position of Lisman toward such redistribution: " Q. In February, 1929? A. Yes, we were buying on the market. Q. You were not buying for investment purposes, were you? A. Not particularly. Q. You were buying to support the market, weren't you? A. We were buying to a good extent against sales. Q. Yes, but the purpose of the purchases on the stock exchange and the distribution that was going on was to stabilize the stock and support the market, isn't that so? A. To stabilize the stock and assist the market. Q. To stabilize the price of the stock? A. The price of the stock, of course. Q. You do that and support the market, don't you? A. We do that by orders. Our orders may or may not support the market. Q. Isn't it a fact that the more sellers you have than buyers, the more you support the market? A. If there are any orders they might. Q. The purpose of buying as you were doing was to support the market, wasn't it? A. Yes, yes, I would say it was. * * * Q. But you were supporting the market in February, 1929? A. We were aiding and supporting the market. * * * Q. You were stabilizing this by buying some shares on the stock exchange and redistributing it in the method that you have told us? A. We were redistributing more, yes, than buying in most cases. * * * Q. You sold through the medium of this distribution, didn't you? A. Right."

Doolittle, the employee of Glenny, called Lisman on the telephone and got into telephonic communication with defendant Traugott. Doolittle's account of his conversation with Traugott is as follows: "A. So I called Lisman and finally talked with Mr. Traugott and told him that I had an order and asked him if he could fill it. He left the office and came back and told me how the stock was quoted; I believe he said it was 35 bid, offered at 36, and that he would be able to let us have 500 shares at $35\frac{1}{2}$. I asked him if that was the best he could do, and he stated that that was the very best he could do; and he said for 60 days placement you will receive one point

concession in stock, you will receive one point. I don't remember just the phraseology. So I said 'Very well, we will take the stock.' "

Defendant Traugott's account of the conversation is substantially the same as Doolittle's. He also says definitely that Doolittle said to him, " I have an order for 500 shares of Camco, Preferred." The defendant Traugott explains the words, " for 60 days placement you will receive one point concession," in the following testimony: " Q. Now, the payment of the $1.00 per share on the 500 shares, or the $500, was a payment for services, wasn't it? A. It was a payment for placing the stock. Q. Well, services in connection with placing the stock? A. Placing the stock, yes. Q. Well, you were paying Glenny, Monro & Moll for doing something, weren't you? A. Paying Glenny, Monro & Moll one point for placing 500 shares of stock. * * * Q. Didn't you testify at the last trial that you paid them a commission? Well, let me withdraw that and I will ask you this: Didn't you say this at the last trial: ' A concession is really an amount of money paid for services rendered; that is what it amounts to in a few words.' Did you say that? A. Is that my testimony? Q. Yes. A. Yes, certainly I did. Q. Is that still your view of it? A. Yes, it is. Q. Is that what this payment was made for? A. Yes, it is, when you define those services. Q. All right. In defining the services, isn't this what you said the last time? A. Yes. Q. Didn't you say, the last time, that it was in reality a commission for selling the stock to whomever they could sell it to? A. Right. Q. Is that still the fact? A. Yes, sir. Q. And is that what it was payment for? A. Yes."

Glenny understood that the $500 resulting from the one dollar concession for sixty days' placement was a payment to Glenny. Doolittle told Balkin about it the next day, saying that there was a dollar a share in it for the firm if the stock stayed placed for sixty days. The same day that the telephonic conversation was held between Doolittle and Traugott, Lisman sent Glenny a written confirmation of the transaction in the following language: " In accordance with telephonic advices of even date, we are pleased to confirm sale to you of:

" 500 shares Consolidated Automatic Merchandising Corporation Preferred Stock at 35½ less 1 point concession to you.

" It is understood that you are to protect the above numbers for a period of sixty days, reimbursing us the 1% per share allowed at time of delivery, should any of the above numbers be re-purchased in the open market at or below the price of 35½ per share.'

And on the same day Glenny sent the plaintiff a notice of the

execution of his order in the following words: " We take pleasure in confirming sale to you today of

| | Debit | Credit |
|---|---|---|
| " 500 Shs. Consolidated Automatic Merchandising Corp. pfd. at 35½..... | $17,750 00 | |
| " Plus commission............... | 75 00 | |
| | $17,825 00 | |

 " Balance due............."

There is no evidence that Glenny advised the plaintiff to hold the stock during the next sixty days, although there is evidence of conversations between plaintiff and Glenny's employees about the stock and its market position. The price of the stock reached a high of thirty-six dollars a share on the Curb Exchange in each of the weeks ending February 15, February 21, March 1, and March 8, 1929. In the week ending April 19, 1929, which included the end of the sixty-day period, Camco, Preferred, sold as high as thirty-six dollars and as low as twenty-five and one-eighth dollars. Never after the week ending March 8, 1929, has it sold on the Curb Exchange at a price higher than thirty-four and seven-eighths dollars, and only during one week at that price. During August, 1929, the highest quotation on the Curb Exchange was seventeen, the lowest ten and one-eighth. In January, 1931, the highest quotation was one and one-eighth, the lowest one-eighth. In February, 1932, the highest quotation as well as the lowest was one-eighth.

On August 19, 1929, plaintiff served on Glenny a written demand for a statement with regard to his purchase of Camco, Preferred, and the next day a reply to his demand was sent him by Glenny stating that the stock was purchased by the broker from Lisman, and that the price at which the stock was bought was $17,750. Three days later Glenny sent an amending statement to the plaintiff in respect to the price, saying: " The price at which the same was bought was $35.50 per share, less one point concession, with the understanding that we were to protect the above mentioned stock sold to you for the period of 60 days, reimbursing F. J. Lisman & Co. the one per cent per share allowed at the time of delivery should any of the above stock be repurchased in the open market at or below the price of $35.50 per share."

In September, 1929, the plaintiff instituted an action against his broker, Glenny, for a rescission of the contract of purchase and sale with a demand for the return of the purchase price. At the Special Term decision was rendered in favor of the plaintiff. (*Kinney* v. *Glenny*, 136 Misc. 301.) Upon appeal to this Appellate Division, the judgment was reversed and the complaint dismissed

on the 7th day of January, 1931. Upon this reversal an opinion was written (231 App. Div. 311). Upon appeal to the Court of Appeals the judgment of the Appellate Division was affirmed on the 20th day of October, 1931. No opinion was written in the Court of Appeals, but the memorandum of affirmance is reported at 257 New York, 560. The 500 shares of Camco, Preferred, together with the dividends received by the plaintiff and interest on the dividends were tendered by the plaintiff to the defendants upon the trial of the present action.

In the prior action of Kinney v. Glenny it has been finally determined that, so far as the plaintiff is concerned, the broker, Glenny, was not the seller of the stock in question to the plaintiff, but was his agent executing for him an order to purchase the stock. This same ruling (the evidence being similar) must be the foundation of our consideration of the problem presented in this case, namely, whether the vendor Lisman in offering to pay Glenny for the placement of the stock acted so contrary to fair dealing by secretly compensating an agent for the plaintiff as to justify a rescission of the contract.

These circumstances must be noticed: Glenny's agent reported to the defendant that he had an order for 500 shares. Glenny in the past had been a member of the distribution syndicate. A placement for sixty days implied keeping the stock out of the market for that period.

We think that there was enough in the conversation between Doolittle and Traugott to advise the defendants that Glenny was acting as a broker, as an agent for an unknown principal. Even should it be thought that this was not so, at least enough was disclosed to put the defendants on notice that such might probably be the case, and to require them in fair dealing to act accordingly. With this knowledge or notice, the defendants thereupon entered into a contract to sell the stock, including in its very terms a provision for a commission or compensation to the broker Glenny for disposing of the stock and keeping it out of the market for sixty days. This is not the ordinary case of one broker selling to another. The defendants did not intend that the concession should be passed along by Glenny to his principal. It was a payment to Glenny. The market at this time evidently needed support or, to use the word of the only defendant who was sworn, it needed assistance. It was patently necessary for a successful redistribution that prices be maintained. To get stock weakly held off the market or to decrease the amount of stock offered would clearly assist. Whether this would be to the interest of such an investor as the plaintiff we cannot say. It is not material. It is sufficient to know that

the agent of the plaintiff was offered and accepted a payment by the seller for a service connected with the purchase and holding by the investor of the stock sold. We cannot divide the contract into a sale at $17,750, and a separate offer unconnected with the sale of $500, if the stock remained off the market for sixty days. It was one transaction, and the acceptance of the defendant's offer of sale was given only after the offer of the concession was stated. Injury to the plaintiff by the conduct of his brokers and the defendants is irrelevant. What plaintiff would have done, had he known of the concession, has not been shown and probably could not have been convincingly shown. The vice lies in the circumstance that the plaintiff did not know of the whole contract negotiated between the defendants and plaintiff and that the defendants joined with the plaintiff's agent in creating a situation where the broker's fidelity to his client's interest was put under the strain of hostile self-interest. Brokers in dealing for their clients must be held to a high standard of single-minded good faith. The toleration even of such an offer as was here made and the receiving of the payment in accordance therewith, even though subject to repayment by the broker in certain eventuality, constitutes a breach of that high standard of obligation. The participation of the defendants in such conduct cannot be compensated by damages. The only adequate remedy is to allow the plaintiff's claim for rescission. No case has been cited which is an absolute precedent for this decision. The principles, however, are illustrated by such cases as *Donemar, Inc.*, v. *Molloy* (252 N. Y. 360); *Reiner* v. *North American Newspaper Alliance* (259 id. 250); *Smith* v. *Seattle, L. S. & E. R. Co.* (72 Hun, 202); *Hovendon & Sons* v. *Millhoff* (83 L. T. R. 41).

It is urged upon us as a reason for denying the plaintiff relief that the plaintiff delayed instituting this action until February 13, 1932, after being advised of the true situation on August 23, 1929. In the meantime, however, the plaintiff had brought an action against his broker, seeking a rescission there. The defendant had knowledge of that action and that plaintiff was appealing to the courts for relief, for it appears that one of the defendants was sworn upon the trial of the action against Glenny. While the courts held against the contention of the plaintiff in his case against the broker that decision was based solely on the circumstance that the plaintiff did not in legal theory buy the stock from the broker, that the broker as to the plaintiff never owned the stock and that there was no sale which could in that action be rescinded. Our opinion in that case referred to the possibility of a rescission in some other action. Until that case was decided by the Court of Appeals, it could not be confidently asserted that the plaintiff had miscon-

ceived his right to the relief there sought. The trial court decided in favor of the plaintiff, and one judge dissented in the Court of Appeals. (See, also, 41 Yale L. J. 949.)

Under all the circumstances the plaintiff, in our judgment, was not so negligent in delaying the bringing of this action as to defeat him on the ground of laches.

The judgment should be reversed on the law and the facts, with costs, and judgment of rescission granted, with costs.

All concur. Present — SEARS, P. J., TAYLOR, THOMPSON, CROSBY and LEWIS, JJ.

Judgment reversed on the law and facts, with costs, and judgment of rescission granted, with costs. Additional findings of fact made.